[No. 83343-5.   En Banc.]
Argued June 8, 2010.     Decided October 27, 2011.

THE STATE OF WASHINGTON, *Respondent*, v. HELEN D. IMMELT, *Petitioner*.

4

*Helen Immelt*, pro se.

*John J. Tollefsen* (of *Tollefsen Law PLLC*), for petitioner.

*Mark K. Roe, Prosecuting Attorney,* and *Charles F. Blackman* and *Seth Aaron Fine, Deputies,* for respondent.

¶1 STEPHENS, J. — Helen Immelt sounded a car horn at length in front of a neighbor's house in the early morning hours. She was arrested for violating a Snohomish County noise ordinance that includes amongst its prohibited noise disturbances horn honking for a purpose other than public safety or originating from an officially sanctioned parade or other public event. She challenges the horn ordinance as overbroad and in violation of free speech protections. We agree that the ordinance is overbroad and reverse Immelt's conviction.[1]

## FACTS AND PROCEDURAL HISTORY

¶2 The Snohomish County code bans "sound that is a public disturbance noise." SNOHOMISH COUNTY CODE (SCC)

---

[1] Immelt makes a number of other claims challenging the constitutionality of the ordinance at issue. Because we find the ordinance must be invalidated on overbreadth grounds, we do not address her other arguments.

10.01.040. The code defines "public disturbance noise" to include, among other things, "[t]he sounding of vehicle horns for purposes other than public safety." SCC 10.01.040(1)(d) (horn ordinance). A violation of SCC 10.010.040 is an infraction unless two violations of the ordinance are committed within a 24-hour period, in which case the second violation is criminalized as a misdemeanor.

¶3 Although the facts of this case are not critical in an overbreadth challenge, *see City of Seattle v. Webster*, 115 Wn.2d 635, 640, 802 P.2d 1333 (1990), we offer them by way of background. Immelt lived in a cul-de-sac neighborhood governed by restrictive covenants. On May 12, 2006, Immelt received a letter from the homeowners' association indicating that she had violated a covenant prohibiting residents from keeping chickens. Immelt learned the complaint was lodged by her neighbor, Mr. Vorderbrueggen.

¶4 A little before 6:00 a.m. the next day, Immelt borrowed a friend's car and repeatedly honked the car's horn in front of Vorderbrueggen's house for approximately 5 to 10 minutes. Her actions awakened several neighbors. Vorderbrueggen called the police. Sergeant David Casey of the Snohomish County Sheriff's Office arrived around 7:00 a.m. and spoke with Immelt about the noise complaint. He then went to take Vorderbrueggen's statement.

¶5 While Sergeant Casey was at Vorderbrueggen's residence, Immelt drove past and made three long car horn blasts. Sergeant Casey followed in his patrol car, stopped Immelt, and arrested her.

¶6 Snohomish County charged Immelt by amended complaint with a violation of the local noise ordinance barring the sounding of a horn for purposes other than public safety, SCC 10.01.040(1)(d). A district court jury convicted Immelt, and her conviction was affirmed by both the superior court and the Court of Appeals. *State v. Immelt*, 150 Wn. App. 681, 208 P.3d 1256 (2009). Immelt petitioned this court for review, raising a variety of claims, including claims that the horn ordinance violated her state and federal constitutional

rights. We granted review. *State v. Immelt*, 167 Wn.2d 1008, 220 P.3d 209 (2009).

## ANALYSIS

¶7 First Amendment protections apply equally to statutes and local ordinances. *Lovell v. City of Griffin*, 303 U.S. 444, 450, 58 S. Ct. 666, 82 L. Ed. 949 (1938). The free speech protections of article I, section 5 of the Washington Constitution also extend to local ordinances. *Kitsap County v. Mattress Outlet*, 153 Wn.2d 506, 511, 104 P.3d 1280 (2005). The interpretation of constitutional provisions and legislative enactments, including municipal ordinances, presents a question of law, which we review de novo. *City of Spokane v. Rothwell*, 166 Wn.2d 872, 876, 215 P.3d 162 (2009); *Fed. Way Sch. Dist. No. 210 v. State*, 167 Wn.2d 514, 523, 219 P.3d 941 (2009) (citing *State v. Chenoweth*, 160 Wn.2d 454, 462, 158 P.3d 595 (2007)). Generally, we presume that legislative enactments are constitutional. *State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008). The party challenging an enactment bears the burden of proving its unconstitutionality. *Voters Educ. Comm. v. Pub. Disclosure Comm'n*, 161 Wn.2d 470, 481-82, 166 P.3d 1174 (2007) (quoting *State v. Hughes*, 154 Wn.2d 118, 132, 110 P.3d 192 (2005), *overruled in part on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)). However, in the free speech context, "the State usually 'bears the burden of justifying a restriction on speech.' " *Id.* at 482 (quoting *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 114, 937 P.2d 154, 943 P.2d 1358 (1997)).

¶8 "[O]ur article I, section 5 analysis of overbreadth follows the analysis under the First Amendment." *Bradburn v. N. Cent. Reg'l Library Dist.*, 168 Wn.2d 789, 804, 231 P.3d 166 (2010). A law is overbroad if it "sweeps within its prohibitions" a substantial amount of constitutionally protected conduct. *City of Tacoma v. Luvene*, 118 Wn.2d 826, 839, 827 P.2d 1374 (1992). "A statute or ordinance will be

overturned only if the court is unable to place a sufficiently limiting construction on a standardless sweep of legislation." *Id.* at 840.

¶9 Immelt claims the horn ordinance is overbroad because it sweeps into its prohibitions constitutionally protected speech. Thus, we must determine whether the horn ordinance actually implicates free speech; some burden on speech must exist before the protections of the First Amendment or article I, section 5 may be invoked. *See State v. Halstien*, 122 Wn.2d 109, 122-23, 857 P.2d 270 (1993) (noting that the "first task in overbreadth analysis is to determine if a statute reaches constitutionally protected speech or expressive conduct" (citing *Luvene*, 118 Wn.2d at 839; *Webster*, 115 Wn.2d at 641)).

¶10 This question does not require us to determine whether Immelt's particular actions amounted to protected speech. An overbreadth challenge allows " 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' " *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S. Ct. 1116, 14 L. Ed. 2d 22 (1965)). The question is whether the horn ordinance impermissibly burdens protected expression. Conduct such as horn honking may rise to the level of speech when the actor intends to communicate a message and the message can be understood in context. *See First Covenant Church of Seattle v. City of Seattle*, 120 Wn.2d 203, 216-17, 840 P.2d 174 (1992) (quoting *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989)).

¶11 Chief Justice Madsen's dissent incorrectly believes the court must examine Immelt's particular conduct in order to decide this overbreadth challenge. *See, e.g.*, dissent (Madsen, C.J.) at 21-22. In *Virginia v. Hicks*, 539 U.S. 113, 115-16, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003), the United States Supreme Court considered an overbreadth challenge

to a policy prohibiting conduct. There, the individual challenging the policy did not "contend that he was engaged in constitutionally protected conduct when arrested." *Id.* at 118. The *Hicks* Court did not find it necessary to first consider whether the particular conduct present in the case constituted speech. Instead, it noted that "[t]he First Amendment doctrine of overbreadth is an exception to our normal rule regarding the standards for facial challenges." *Id.* The policy reasons for such an exception arise "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech— especially when the overbroad statute imposes criminal sanctions." *Id.* at 119.

> Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech . . . harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas. Overbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces these social costs caused by the withholding of protected speech.

*Id.* (citation omitted). Given these policy concerns, an overbreadth challenge such as the one presented here does not require a showing that the specific conduct of the individual challenging the law constitutes speech. Chief Justice Madsen's dissent properly notes that the overbreadth doctrine attenuates as the sanctioned behavior moves from pure speech toward conduct. Dissent (Madsen, C.J.) at 22-23 (citing *Broadrick*, 413 U.S. at 615). But *Broadrick*'s discussion of the attenuation of the overbreadth doctrine occurs in the context of its requirement that the overbreadth of a statute be substantial before it may be invalidated. *Broadrick*, 413 U.S. at 615-16. As noted below, the reach of this ordinance is substantial, as it sweeps into its scope many instances of protected expression through horn honking. These instances are not the type of speculative predictions cautioned against by *Broadrick*. *See*

*id.* at 615. Rather, this ordinance, on its face, prohibits legitimate expressions of speech conveyed by a horn honk.

¶12 A moment's reflection brings to mind numerous occasions in which a person honking a vehicle horn will be engaging in speech intended to communicate a message that will be understood in context. Examples might include a driver of a carpool vehicle who toots a horn to let a coworker know it is time to go, a driver who enthusiastically responds to a sign that says "honk if you support our troops," wedding guests who celebrate nuptials by sounding their horns, and a motorist who honks a horn in support of an individual picketing on a street corner. Thus, we reject the Court of Appeals' conclusion that horn honking is a type of conduct that does not involve speech. *Immelt*, 150 Wn. App. at 687. Horn honking does constitute protected speech in many instances, regardless of whether it would constitute protected speech in Immelt's particular case.

¶13 We acknowledge that there is authority from other jurisdictions suggesting horn honking is never expressive conduct worthy of free speech protections, but we find these cases unpersuasive. *See, e.g., Weil v. McClough*, 618 F. Supp. 1294, 1298 (S.D.N.Y. 1985) (rejecting an overbreadth challenge to a local ordinance that prohibited horn honking except to provide warning of imminent danger); *State v. Compas*, 1998 MT 140, 290 Mont. 11, 17, 964 P.2d 703 (holding that the defendant's conviction for honking her car horn to protest a local recreational vehicle park did not violate her rights to free expression); *Meaney v. Dever*, 326 F.3d 283, 287-88 (1st Cir. 2003) (expressing misgivings that horn honking constitutes expressive conduct but assuming arguendo that it does and rejecting free speech claims on other grounds). In *Meaney*, the government action stemmed not from an ordinance but from Meany's suspension from the local police force as punishment for his horn-blowing activities. *Id.* at 284-86. *Compas* did not involve an overbreadth challenge. These cases are of little relevance here.

¶14 Even *Weil*, which did involve an overbreadth challenge to an ordinance prohibiting horn honking, is distinguishable. There the court found the ordinance was a reasonable time, place, and manner restriction, which precluded an overbreadth challenge. *Weil*, 618 F. Supp. at 1298. Although Snohomish County argues here that the horn ordinance is a reasonable time, place, and manner restriction, it fails to develop this argument. *See* Suppl. Br. of Resp't at 7. And it is dubious that this ordinance is a proper time, place, and manner restriction where it prohibits horn honking in a content-based manner, i.e., horn honking is permissible for official parades and other public events but not to express support for the lone person holding a "support our troops" sign on a street corner.[2] We therefore decline to follow the lead of other jurisdictions that have questioned the expressive value of horn honking. While it does not involve spoken words, horn honking may be clearly a form of expressive conduct.

¶15 Having concluded that some horn honking may constitute protected speech, our overbreadth analysis requires us to consider whether the horn ordinance at issue sweeps into its prohibitions instances of protected honking. It is clear from the face of the ordinance that it does. By its terms, it categorically prohibits horn-honking for any purpose other than public safety, unless it is a sound "originating from officially sanctioned parades and other public events." SCC 10.01.050(1)(*l*). While it is not entirely clear what constitutes a public event, there is no basis to believe it includes the examples cited above: the carpool driver, the

---

[2] Snohomish County also argues that its ordinance regulates only the nonspeech elements of horn honking, thus justifying "incidental limitations on First Amendment freedoms." Suppl. Br. of Resp't at 8-9 (citing *United States v. O'Brien*, 391 U.S. 367, 376-77, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968)). To the contrary, the ordinance draws no distinction between the speech and nonspeech elements of horn honking, but rather broadly prohibits the use of a horn to communicate in all but a few circumstances. Therefore, we cannot say that it meets the *O'Brien* test as being "no greater than is essential to the furtherance of [a substantial governmental] interest." *O'Brien*, 391 U.S. at 377.

wedding guest, the troop supporter, or the individual honking upon passing a picketer on the street corner.

¶16 Determining that the horn ordinance proscribes some protected speech activity does not end our inquiry. To violate the First Amendment, the horn ordinance must prohibit a *substantial* amount of protected activity.

> The concept of "substantial overbreadth" is not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984). "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* at 801.

¶17 The purpose of the overbreadth doctrine is to "strike a balance between competing social costs." *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) (citing *Hicks*, 539 U.S. at 119-20).

> On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects. In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.

*Id.* In short, we must weigh the amount of protected speech proscribed by the ordinance against the amount of unprotected speech that the ordinance legitimately prohibits.

¶18 In undertaking this analysis, we first emphasize that local governments maintain a legitimate interest in protecting residents from excessive and unwelcome noise. *Ward v. Rock Against Racism*, 491 U.S. 781, 796, 109 S. Ct.

2746, 105 L. Ed. 2d 661 (1989); *Kovacs v. Cooper*, 336 U.S. 77, 83, 69 S. Ct. 448, 93 L. Ed. 513 (1949) (observing that the "police power of a state extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community"). Additionally, local governments can lawfully prohibit some expressive conduct. *See City of Seattle v. Huff*, 111 Wn.2d 923, 926-28, 767 P.2d 572 (1989) (holding that an ordinance prohibiting harassing telephone calls withstands free speech challenges because it is reasonable in light of the purpose served by the forum and is viewpoint neutral). In short, a properly tailored ordinance prohibiting disturbing horn honking that is intended to annoy or harass would likely survive scrutiny.[3]

¶19 The horn ordinance here does not survive scrutiny. It is substantially overbroad, "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292. It prohibits a wide swath of expressive conduct in order to protect against a narrow category of public disturbances.

¶20 Nor can we place "a sufficiently limiting construction" on the standardless sweep of this ordinance. *Luvene*, 118 Wn.2d at 840. Relying on *Luvene* and *O'Day v. King County*, 109 Wn.2d 796, 749 P.2d 142 (1988), Snohomish County asks us to construe the horn ordinance "to proscribe only unprotected conduct." Suppl. Br. of Resp't at 16. Justice J.M. Johnson's dissent believes we can but, unlike in *Luvene* and *O'Day*, the ordinance here gives us no basis to do so. In

---

[3] This is not to say that annoying or harassing expressive conduct falls entirely outside the ambit of protected speech, as the Court of Appeals suggested. *Immelt*, 150 Wn. App. at 687. It is a mistake to focus on the content of expressive conduct, i.e., whether it is annoying or harassing, rather than its nonspeech elements, which may be appropriately regulated. *See O'Brien*, 391 U.S. at 377. Even criminal harassment statutes must be circumscribed to exclude protected expression. *See, e.g., State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010) (recognizing the "true threats" doctrine in the context of an antiharassment statute and noting that "[t]he First Amendment prohibits the State from criminalizing communications that bear the wording of threats but which are in fact merely jokes, idle talk, or hyperbole").

*Luvene*, we read an intent element into a potentially over-broad loitering ordinance based on the language of the ordinance; specifically, it prescribed loitering only for the " 'purpose' " of engaging in drug-related activity. *Luvene*, 118 Wn.2d at 842. Consistent with prior case law, we construed "purpose" to impose a mens rea element. *Id*. Similarly, in *O'Day*, we narrowly construed a nude-dancing prohibition in light of its several exceptions for nonobscene expression, including dramatic works, dance, and exhibitions, as well as educational purposes. *O'Day*, 109 Wn.2d at 806. Given these exceptions, we found it clear that the government intended to proscribe only obscene, constitutionally unprotected expression. *Id*. Here, in contrast, the language of the horn ordinance provides no basis for a sufficiently limiting construction to avoid an overbreadth problem. Its exceptions for public safety and officially sanctioned parades or other public events cannot reasonably be construed to encompass myriad instances of protected expression that occur outside of public events.[4]

## CONCLUSION

¶21 We need not decide whether Immelt's particular conduct would constitute protected speech. For purposes of this overbreadth challenge, the ordinance under which Immelt was convicted sweeps too broadly in banning protected forms of expressive conduct involving horn honking.

---

[4] Justice J.M. Johnson's dissent suggests that " 'other public events' " as discussed in the statute need not be officially sanctioned events, and thus could include horn honking in support of political and religious causes or community events. Dissent (J.M. Johnson, J.) at 36. Setting aside the question of whether this is a reasonable reading of the statute, it fails to save it from an overbreadth challenge. Even the broadest notion of "public events" would not include the lone troop supporter, the carpool driver, the wedding guest, the driver passing a picketer, or similar instances of protected expression.

It therefore fails constitutional scrutiny. We reverse Immelt's conviction.

ALEXANDER, CHAMBERS, OWENS, and FAIRHURST, JJ., and SANDERS, J. PRO TEM., concur.

¶22 MADSEN, C.J. (dissenting) — Helen Immelt blew her car horn for *10 minutes* in front of a neighbor's home between 5:30 and 6:00 a.m. in evident anger and retaliation and to irritate and annoy the neighbor, and then repeated the horn blowing an hour later in an encounter with another neighbor. The majority says that the statute prohibiting this conduct is facially unconstitutional.

¶23 The majority is able to reach this conclusion because it fails to consider whether the conduct of blowing a car horn is speech and, in particular, whether Ms. Immelt's conduct constitutes symbolic speech. The majority claims that the facts here make no difference in the analysis and immediately launches into an overbreadth analysis. However, an overbreadth analysis is the exception, not the rule. The challenged ordinance's horn-honking provision regulates conduct not commonly associated with expression, and merely because it is possible to think up possible impermissible applications of the ordinance does not mean that an overbreadth analysis is required, much less that the regulation is facially unconstitutional.

¶24 The proper course in this case is to examine Ms. Immelt's own conduct, leading to the conclusion that her horn honking was not sufficiently imbued with communicative elements to raise any First Amendment issue. This conclusion follows from the United States Supreme Court's analysis when conduct is claimed to implicate the First Amendment, which is as follows: First, if only conduct is involved, then the First Amendment does not come into play (to determine whether conduct and not speech is involved, the United States Supreme Court examines the

particular conduct in the context in which it occurs). Second, if both speech and nonspeech elements are combined in a course of conduct, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Texas v. Johnson*, 491 U.S. 397, 406, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989). If the "conduct was expressive," a court must "decide whether the . . . regulation is related to the suppression of free expression." *Id.* at 403. If it is not, then the "less stringent standard" of *United States v. O'Brien*, 391 U.S. 367, 377, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968), controls, which applies when assessing whether regulations of noncommunicative conduct violate free speech protections. *Johnson*, 491 U.S. at 403. But the first step, under these United States Supreme Court decisions, is to examine the challenger's particular conduct to determine whether protected speech is at issue.

¶25 Rather than consider whether Ms. Immelt's conduct is even protected speech, the majority simply assumes without analysis that the ordinance regulates speech and then invalidates on overbreadth grounds the ban on blowing a horn other than for public safety reasons. Under First Amendment precedent the conduct at issue here has no communicative elements and is not protected speech, and the challenged law regulates noise, not expression. This does not mean that a proper as-applied challenge could not be brought in a case where horn honking sufficiently imbued with communicative elements is at issue.

¶26 The majority is also out of step with the great weight of authority. Anti-noise statutes and ordinances have been routinely upheld in the face of overbreadth and vagueness challenges, and in particular, regulations of horn honking have been upheld by many courts considering the issue. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989); *Gaughan v. City of Cleveland*, No. 06-3010, 2007 WL 29175, 2007 U.S. App. LEXIS 281 (6th Cir. Jan. 3, 2007) (unpublished); *Meaney v.*

*Dever*, 326 F.3d 283, 287-88 (1st Cir. 2003); *Weil v. McClough*, 618 F. Supp. 1294, 1296 (S.D.N.Y. 1985); *Village of Kelleys Island v. Joyce*, 146 Ohio App. 3d 92, 765 N.E.2d 387 (2001); *State v. Compas*, 1998 MT 140, 290 Mont. 11, ¶¶ 20-21, 25, 964 P.2d 703; *People v. Holt*, 271 Ill. App. 3d 1016, 1027, 649 N.E.2d 571, 208 Ill. Dec. 515 (1995).

¶27 Unfortunately, the majority places this state's law on the outer fringe of responsible decision making. Rather than following the United States Supreme Court's analysis for determining whether the First Amendment is even implicated under the facts here, the majority merely accepts the premise that a handful of proposed hypothetical horn honking circumstances renders the ordinance unconstitutional. I cannot agree and therefore dissent.

¶28 Under other facts, it is possible that the ordinance might be held to be unconstitutional as applied. However, it is not unconstitutional in this case, either on its face or as applied.

Discussion

1. Immelt's horn honking is not speech under the *Spence-Johnson* test.

¶29 As mentioned, because this case involves conduct, not verbal or written communication, the first issue that the court should examine is whether protected speech is at issue. Contrary to the majority's approach, this inquiry does not involve speculating about possible factual scenarios where honking a car horn might convey a message, but instead should focus on whether Ms. Immelt's horn honking itself constitutes speech.

¶30 Conduct may be sufficiently imbued with elements of communication to come within the protection of the First Amendment. *Johnson*, 491 U.S. at 404. However, for conduct to be considered protected speech, a court must examine the conduct that actually occurred within the context of its occurrence. There must be both the intent to

convey a particularized message and a great likelihood that the message will be understood by those who observe the conduct.

¶31 In *Spence v. Washington*, 418 U.S. 405, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974), the conduct at issue was the display of an upside down American flag with a peace symbol attached. The Court began its analysis by stating that it was "necessary to determine" whether the conduct "was sufficiently imbued with elements of communication." *Id.* at 409. The Court identified three considerations: the nature of the individual's activity, combined with the factual context and environment in which the activity was undertaken. *Id.* at 409-10. The Court examined the conduct and said that it had long recognized the communicative connotations of flags and had little doubt that the individual had communicated through the use of symbols. The context was a protest over expansion of the Vietnam War and the killings at Kent State University. As to environment, the display was on private property and involved the individual's own flag. The Court then concluded: "An *intent to convey a particularized message* was present, and in the surrounding circumstances *the likelihood was great that the message would be understood by those who viewed it.*" *Id.* at 410-11 (emphasis added).

¶32 In *Johnson*, as mentioned, the Court noted that the protection of the First Amendment does not end at the written or spoken word, and "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.' " *Id.* at 404 (quoting *Spence*, 418 U.S. at 409). However, the Court also reiterated another important principle, i.e., that it "ha[d] rejected 'the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaged in the conduct intends thereby to express an idea.' " *Id.* (quoting *O'Brien*, 391 U.S. at 376).

¶33 *Johnson* involved a conviction of an individual for desecration of a venerated object after he burned the

American flag in protest against renomination of Ronald Reagan as a presidential candidate. Reiterating the test from *Spence*, the Court said that "[i]n deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a *particularized message* was present, *and* [*whether*] *the likelihood was great that the message would be understood by those who viewed it.*' " *Id.* (emphasis added) (second and third alterations in original) (quoting *Spence*, 418 U.S. at 410-11).

¶34 The *Spence-Johnson* test may not, however, be applied so narrowly as to withdraw from the protection of the First Amendment conduct that is unquestionably within the First Amendment. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995). The conduct at issue in *Hurley* was marching in a parade, and the Court found the First Amendment implicated because "[n]ot many marches . . . are beyond the realm of expressive parades."[5] *Id.* The Court stated that some conduct found to be within the protection of the First Amendment shows that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll."[6] *Id.* (citation omitted). Put another way, in terms the Court later used, marching in a parade is conduct that is

---

[5] In *Hurley*, plaintiffs, who were gay, lesbian, and bisexual descendants of Irish immigrants, successfully argued that their exclusion from a St. Patrick's Day parade violated state public accommodations law. Defendant organizers of the parade unsuccessfully appealed. The United States Supreme Court held that application of the public accommodations law so as to effectively require the organizers "to alter the expressive content of their parade" violated the "fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 572-73.

[6] Verse and most likely music as well are clearly speech, not symbolic speech, but all three examples are, as the Court said, unquestionably within the scope of the First Amendment.

"inherently expressive."[7] *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66-67, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006).[8]

¶35 As courts have observed, it is important to bear in mind the Court's caution in *Hurley* when applying the *Spence-Johnson* test. Thus, the Second Circuit stated that for conduct to be sufficiently imbued with communicative elements requires that a "court must find, at the very least, an intent to convey a *'particularized message'* along with a *great likelihood that the message will be understood by those viewing it.*" *Zalewska v. County of Sullivan*, 316 F.3d 314, 319 (2d Cir. 2003) (emphasis added) (quoting *Johnson*, 491 U.S. at 404; *Spence*, 418 U.S. at 410-11).

¶36 With this analysis in mind, I turn to the question whether Ms. Immelt's horn honking constituted symbolic speech or merely conduct. In *Spence*, as in *Johnson* and other cases raising the issue, the Court specifically examined the particular conduct of the person seeking First Amendment protection when deciding whether the conduct was sufficiently expressive to constitute protected speech. *Spence*, 418 U.S. at 408-09; *Johnson*, 491 U.S. at 404 ("[i]n deciding whether *particular conduct* possesses sufficient

---

[7] The Court in *Rumsfeld*, which postdates the other cases providing explanations for what constitutes speech, said that "we have extended First Amendment protection only to conduct that is inherently expressive." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006). If this is a new test for when conduct equals speech, it is a more demanding standard than the *Spence-Johnson* test. Horn honking would never be speech, it would seem. However, the Court may have been explaining that after assessing speech under the *Spence-Johnson* analysis, the conduct that was found to be speech turned out to be "inherently expressive," given that the Court cited *Johnson* for its statement and that the conduct in both *Spence* and *Johnson* involved symbolic speech in connection with the flag. And, while the Court did say that the activity before it was not inherently expressive, it also considered how an observer would (or would not) understand the conduct that was regulated. *Id.*

[8] One author proposes that some activity invokes the First Amendment as symbolic speech because the activity, while not in and of itself speech, is so closely entwined with speech as to be inseparable from it, with marching being in this category. James M. McGoldrick, Jr., *Symbolic Speech: A Message from Mind to Mind*, 61 OKLA. L. REV. 1, 13 (2008). *Hurley* would fit in this category.

communicative elements to bring the First Amendment into play").

¶37 In *Colten v. Kentucky*, 407 U.S. 104, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972), as another example, the United States Supreme Court upheld a state court decision denying First Amendment protection to conduct designed merely to annoy or harass, based on its assessment of the particular conduct of the challenger and the regulation at issue. In *Colten*, an individual was convicted of disorderly conduct on the basis of his failure to leave a congested roadside where a friend in another car was being ticketed. The defendant was asked at least five times to leave. *Id.* at 107-08. The state statute under which he was convicted was construed by the state court to be violated by conduct done with the predominant intent to cause a public inconvenience, annoyance or alarm, with this intent established either by the lack of a bona fide intention to exercise a constitutional right or the fact that the interest in exercising the right was insignificant in comparison to the inconvenience, annoyance, or alarm caused by the defendant's conduct. *Id.* at 108-09. The United States Supreme Court determined that the defendant could be asked to move on as he had no constitutional right to observe issuance of a traffic ticket or to engage the officer issuing the ticket in conversation. *Id.* at 109.

¶38 The Court rejected the defendant's overbreadth claim, observing that as the statute was construed an individual could not be convicted merely for expressing unpopular or annoying ideas and the defendant's "own conduct was not immune under the First Amendment and *neither is his conviction vulnerable on the ground that the statute threatens constitutionally protected conduct of others*." *Id.* at 111.

¶39 With regard to horn-honking in particular, the court in *Meaney*, 326 F.3d at 288, observed that horn honking is "not an expressive act *a fortiori*, and thus does not implicate the First Amendment unless context establishes it as such."

¶40 Thus, this court should consider Ms. Immelt's particular conduct—her horn honking—in determining whether speech is even at issue in this case. When her particular conduct is examined, the appropriate conclusion is that speech is not at issue in this case.

¶41 The record shows that Ms. Immelt honked her horn on two occasions to express her displeasure with neighbors she believed to be opposed to her having chickens at her residence in violation of neighborhood covenants. The first incident occurred between 5:30 and 6:00 a.m. outside a neighbor's house and the second occurred about an hour later the same day in response to a hand movement of another neighbor, the specific nature of which was disputed.

¶42 Initially, there is nothing in Ms. Immelt's conduct that is "inherently expressive" such as burning or defacing the nation's flag in protest, nor was the conduct so associated with expressive communication as to constitute speech, such as marching in a parade.

¶43 Ms. Immelt concedes that the day before the horn honking she had yelled and cursed at a neighbor in a dispute over a complaint about her chickens and had engaged in a confrontation with the neighborhood association president that degenerated into a shouting match attracting other neighbors. She honked her horn for 10 minutes the next morning beginning at 5:50 a.m., and about an hour later honked again at another neighbor. Immelt was effectively disturbing the peace of her neighbors in retaliation for the neighborhood association's notice to her that she was not permitted to keep chickens at her home. Immelt made a lot of noise to irritate her neighbors and, in a word, that is what the honking was. Noise—loud noise.

¶44 But to come within the protection of the First Amendment, it is not enough that Ms. Immelt retaliated with loud noise, or even that she may have intended her horn honking to express the idea that she was unhappy with her neighbors. Surely if Ms. Immelt had thrown a rock

through her neighbor's window this court would not mistake her conduct for protected speech. *See, e.g.*, *O'Brien*, 391 U.S. at 376 ("speech" does not occur whenever the person engaging in the particular conduct intends thereby to express an idea); *Johnson*, 491 U.S. at 404 (same). The honks may have been intended in some part to express her emotions—anger, hostility, frustration—but they do not meet the *Spence-Johnson* test for determining what conduct constitutes speech. The honks did not convey *a particularized message* and *were not likely to be understood as conveying a particular message.* Rather, they were sounds made to annoy or harass, and not speech within the protection of the First Amendment.

¶45 The majority does not examine Ms. Immelt's particular conduct at issue in the context in which it occurred. But under the *Spence-Johnson* analysis, context must be taken into account. General assumptions about horn honking are inappropriate. Nonetheless, without regard to Ms. Immelt's *particular* horn honking, the majority concludes that a range of hypothetical horn honking qualifies as symbolic speech that is regulated by the ordinance, and therefore an overbreadth analysis is proper. I disagree with the majority's ill-considered approach.

¶46 Where conduct is concerned, the Court has made it very clear that when an overbreadth challenge is made, it must be closely scrutinized to assure that the challenge is properly adjudicated. In *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973), the Court explained, with respect to facial overbreadth challenges:

> [T]he plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, *attenuates as* the otherwise unprotected *behavior* that it forbids the State to sanction *moves* from "pure speech" *toward conduct* and that conduct–even if expressive–falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over

harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech *to some unknown extent, there comes a point where that effect–at best a prediction*–cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe.

(Emphasis added.) Accordingly, and "[t]o put the matter another way," as the Court said, "the overbreadth of a statute must not only be real, but substantial as well, *judged in relation to the statute's plainly legitimate sweep." Id.*

¶47 "[T]he core point [of *Broadrick* is that] the Court will be hostile to facial condemnation of statutes whose central focus is prohibition of tangible harms unrelated to the content of the expression generated by the production of those harms." Henry Paul Monaghan, *Overbreadth*, 1981 SUP. CT. REV. 1, 28. The Ninth Circuit has observed, "The lesson we take from *Broadrick* and its progeny is that a facial freedom of speech attack must fail unless, at a minimum, the challenged statute 'is directed narrowly and specifically at expression or conduct commonly associated with expression.' " *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988)).

¶48 "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984). "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* at 801. The overbreadth analysis from *Broadrick* and its progeny is not applicable every time a challenger raises the possibility that a statute could be applied under conditions where speech might be implicated.

¶49 Here, an overbreadth analysis is inappropriate. The challenged regulation simply is not concerned with expression or conduct associated with expression. Under *Broadrick* this case does not present a proper facial overbreadth challenge even if there is some speech element involved. The statute's effect of deterring protected speech is at best, a prediction, and the majority's speculation unnecessarily prevents the government from enforcing the ordinance in circumstances where conduct admittedly in its power to proscribe is at issue.

¶50 This does not mean that an individual could not assert an as-applied claim, and indeed, this is the appropriate claim if an individual is in fact charged with or convicted of violating the ordinance by honking his or her horn in political protest, for example.

¶51 Instead of an inappropriate overbreadth analysis, the majority should examine Ms. Immelt's own conduct and decide whether it is speech. As explained, in the cases in which the United States Supreme Court has determined whether conduct involves speech, the Court has examined the specific conduct of the individual claiming First Amendment protection. Here, such an examination effectively ends the First Amendment inquiry.[9]

---

[9] The majority and Justice J.M. Johnson's dissent maintain that it is unnecessary to consider whether Ms. Immelt's own conduct is protected speech before turning to her overbreadth claim. Majority at 7; dissent (J.M. Johnson, J.) at 31-32. But as explained, the court should not engage in an overbreadth inquiry. Further, neither the challenged ordinance provision nor Ms. Immelt's own conduct involve the spoken or written word, or conduct traditionally imbued with expressive import. Thus, first determining whether any "speech," i.e., expressive conduct, occurred so as to implicate the First Amendment is the appropriate inquiry. This is exactly how the United States Supreme Court has approached similar issues.

In *Johnson*, 491 U.S. at 403, the Court observed that Mr. Johnson was convicted of desecrating the flag as a result of his having burned it. He was not convicted based on having uttered any words. Faced with facts implicating conduct rather than words, the Court held that it was therefore necessary to determine, first, whether Johnson's act of burning the flag was expressive conduct permitting him to invoke the First Amendment:

Johnson was convicted of flag desecration for burning the flag rather than for uttering insulting words. This fact somewhat complicates our consideration of his conviction under the First Amendment. We must *first determine whether Johnson's burning of the flag constituted expressive conduct, permitting him to invoke the First Amendment* in challenging his conviction. See, *e.g., Spence* v. *Washington*, 418 U.S. 405, 409-411[, 94 S. Ct. 2727, 41 L. Ed. 2d 842] (1974).

*Johnson*, 491 U.S. at 402-03 (emphasis added) (footnote omitted). As the Court explained, the First Amendment literally pertains only to "speech," but the Court had recognized that its protection is not confined to only the spoken or written word, but may extend to expressive conduct:

> The First Amendment literally forbids the abridgment only of "speech," but we have long recognized that its protection does not end at the spoken or written word. While we have rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," *United States* v. *O'Brien*, [391 U.S. 367,] 376, [88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968)], we have acknowledged that conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," *Spence, supra*, at 409[, 94 S. Ct. at 2730].

*Johnson*, 491 U.S. at 404. Again referring to the necessity of determining whether conduct even implicates the First Amendment, the Court stated:

> In deciding whether particular conduct possesses sufficient communicative elements *to bring the First Amendment into play*, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." 418 U. S., at 410-411.

*Johnson*, 491 U.S. at 404 (alterations in original) (emphasis added). If the conduct is expressive, then the court must decide what standard applies to determine the constitutionality of the regulation at issue, as explained next in my opinion. *See Johnson*, 491 U.S. at 403.

Thus, under the circumstances in this case, the court should first examine Ms. Immelt's specific conduct to determine whether the First Amendment is even implicated by her conduct, just as the Court examined Mr. Johnson's specific conduct in *Johnson*. If her conduct is not expressive conduct for purposes of First Amendment protection, then we should not address her First Amendment claims at all, regardless of whether in another instance horn honking might constitute expressive conduct.

This is not a matter of confusing an overbreadth challenge with an "as applied" challenge, contrary to the dissent's mistaken view, dissent (J. Johnson, J.) at 32, but a matter of whether it is appropriate to consider the First Amendment claims at all.

*Virginia v. Hicks*, 539 U.S. 113, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003), cited by the majority, does not require a contrary approach. The overbreadth doctrine was designed as a "departure from traditional rules of standing." *Broadrick*, 413 U.S. at 613. The Court observed in *Hicks* that the state of Virginia petitioned for certiorari after the Virginia Supreme Court had already invalidated the challenged policy on overbreadth grounds. Under those circumstances, the Court's jurisdiction to review the First Amendment issue on the *merits* was clear. *Hicks*, 539 U.S. at 120 (citing *ASARCO Inc. v. Kadish*, 490 U.S. 605, 619, 109 S. Ct. 2037,

2. Even if the horn honking was expressive conduct, the horn honking statute is constitutional under the *O'Brien* test.

¶52 Even assuming that some expressive element is involved, the result should be the same. In *Johnson*, the Court explained the proper analysis when a challenger claims that his or her conviction for engaging in particular conduct is in violation of the First Amendment. First, as explained above, the Court said it must determine whether the conduct was expressive conduct. Then,

> [i]f [the] conduct was expressive, we next decide whether the State's regulation is related to the suppression of free expression. See, *e. g.*, *United States* v. *O'Brien*, 391 U. S. 367, 377[, 88 S. Ct. 1673, 1679, 20 L. Ed. 2d 672] (1968); *Spence, supra*, at 414, n.8[, 94 S. Ct. at 2732, n.8]. If the State's regulation is not related to expression, then the less stringent standard we announced in *United States* v. *O'Brien* for regulations of non-communicative conduct controls. See *O'Brien, supra*, at 377[, 88 S. Ct. at 1679]. If it is, then we are outside of *O'Brien*'s test, and we must ask whether this interest justifies [the] conviction under a more demanding standard.

*Johnson*, 491 U.S. at 403. As explained in *O'Brien*, when

> "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. . . . [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

---

104 L. Ed. 2d 696 (1989)). The Court left "for another day the question whether our ordinary rule that a litigant may not rest a claim to relief on the legal rights or interests of third parties would exclude a case such as this from initiation in federal court." *Id.* at 121 (citation omitted).

*O'Brien*, 391 U.S. at 376-77. Examination under this test shows that that even if there is a speech element to the horn honking, the ordinance does not impermissibly regulate speech.

¶53  The county ordinance is aimed at noise. Horn honking falls within the statute's legitimate aim to proscribe " 'public disturbance noise,' " defined as any sound that "endangers or injuries the safety or health of humans or animals, or endangers or damages personal or real property, or annoys, disturbs or perturbs any reasonable person of normal sensitivities," Snohomish County Code (SCC) 10.01.020(25), or is a sound specifically listed in SCC 10.01.040(1) or 10.01.040(2). (Horn honking is listed in SCC 10.01.040(1)(d).) The purpose of the noise ordinance "is to minimize the exposure of citizens to the physiological and psychological dangers of excessive noise and to protect, promote and preserve the public health, safety and welfare. It is the express intent of the county to control the level of noise in a manner which promotes the use, value and enjoyment of property; sleep and repose; commerce; and the quality of the environment." SCC 10.01.010(1).

¶54  Under the *O'Brien* analysis, *first*, the county has authority to regulate public disturbance noise. *Second*, the county has a " 'substantial interest in protecting its citizens from unwelcome noise.' " *Ward*, 491 U.S. at 796 (quoting *Taxpayers for Vincent*, 466 U.S. at 806).

¶55  *Third*, this interest is unrelated to the suppression of free expression. The "principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.' " *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763, 114 S. Ct. 2516, 129 L. Ed. 2d 593 (1994) (quoting *Ward*, 491 U.S. at 791). Government may not regulate speech on the basis of its hostility or favoritism towards the message that is expressed. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992). "Government regulation of expressive activity is

content neutral so long as it is '*justified* without reference to the content of the regulated speech.' " *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)).

¶56 The ordinance is not concerned with speech or content of speech, and its purpose is to protect citizens from public disturbance noise. It is, quite simply, an anti-noise ordinance.

¶57 *Finally*, any incidental restriction on First Amendment freedoms is no greater than necessary to control the exposure of citizens to the physiological and psychological dangers of excessive noise. The ordinance permits horn honking for the purpose of warning of danger, which is the obvious reason why horns are necessary parts of vehicles. Significantly, RCW 46.37.380(1) mandates that every motor vehicle operating on the highway shall be equipped with a horn in good working order, capable of being heard from at least 200 feet away, and states that "[t]he driver of a motor vehicle shall when reasonable necessary to insure safe operation give audible warning with his or her horn but *shall not otherwise use such horn when upon a highway.*" (Emphasis added.) This state statute recognizes that horns in automobiles have a legitimate safety purpose, but then expressly directs that they shall not be used for any other purpose on the highway. The constitutionality of the statute is not before the court, but I believe that in light of *O'Brien,* it would easily pass a First Amendment challenge if one were brought.

¶58 Assuming that there is a speech component to Ms. Immelt's horn honking, the ordinance is constitutional under the *O'Brien* test.

¶59 I would hold that Ms. Immelt's horn honking was not speech under the *Spence-Johnson* test, that there is no basis for considering hypothetical horn honking to be speech, and that in any event, even if Ms. Immelt's horn honking is presumed to be expressive, under the *O'Brien* test the statute does not impermissibly regulate speech. For

these reasons, I do not agree with the majority's overbreadth analysis in this case.

### 3. Immelt's remaining challenges are meritless.

¶60 There is no merit to Ms. Immelt's prior restraint claim.[10] Her conduct did not constitute speech. Also, her prior restraint challenge is inappropriate because at issue is an ordinance of general application that prohibits certain conduct, not censorship of speech.

¶61 Next, Ms. Immelt raises both facial and as-applied void-for-vagueness claims. "To satisfy due process, 'a penal statute [must] define the criminal offense [(1)] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [(2)] in a manner that does not encourage arbitrary and discriminatory enforcement.' *Kolender* v. *Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983). The void-for-vagueness doctrine embraces these requirements." *Skilling v. United States*, ___ U.S. ___, 130 S. Ct. 2896, 2927-28, 177 L. Ed. 2d 619 (2010); *see State v. Watson*, 160 Wn.2d 1, 6, 154 P.3d 909 (2007).

¶62 Ms. Immelt is not entitled to assert a facial challenge. " '[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,' " and this "rule makes *no exception for conduct in the form of speech.*" *Holder v. Humanitarian Law Project*, ___ U.S. ___, 130 S. Ct. 2705, 2719, 177 L. Ed. 2d 355 (2010) (emphasis added) (alteration in original) (quoting *Vill. of Hoffman Estates v.*

---

[10] We recently turned to federal case law for the definition of a prior restraint. The United States Supreme Court's definition is:

" '[A]dministrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.' " M[elville B.] Nimmer, Nimmer on Freedom of Speech[: *A Treatise on the Theory of the First Amendment*] § 4.03, p. 4-14 (1984). . . . Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—'are classic examples of prior restraints.

*In re Marriage of Suggs*, 152 Wn.2d 74, 80-81, 93 P.3d 161 (2004) (emphasis omitted) (alterations in original) (quoting *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 125 L. Ed. 2d 441 (1993)).

*Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982)). The ordinance plainly prohibits horn honking for reasons other than public safety, and declares it to be a misdemeanor to honk a horn twice within 24 hours in contravention of this prohibition. Ms. Immelt's conduct is clearly proscribed.

¶63 She also raises an as-applied challenge. However, her conduct falls squarely within the ordinance's prohibition, as explained. Her as-applied challenge is without merit as well.

## Conclusion

¶64 The majority's decision rests upon an incorrect analytical approach and speculation. For the reasons stated, I dissent. Ms. Immelt's horn honking was not speech and the ordinance is not subject to facial invalidity on either overbreadth or vagueness grounds. I would uphold the anti-horn honking provision of the ordinance and would affirm Ms. Immelt's conviction.

C. JOHNSON, J., concurs with MADSEN, C.J.

¶65 J.M. JOHNSON, J. (dissenting) — Both the majority opinion and Chief Justice Madsen's dissent fail to properly analyze the constitutional overbreadth challenge to Snohomish County Code (SCC) 10.01.040 and .080(3) (horn ordinance). I write separately to correct these analytical mistakes. Further, because the horn ordinance does not violate Helen Immelt's free speech rights, I respectfully dissent.

## A. Overbreadth

¶66 Reasonably construed, the county's horn ordinance is not unconstitutionally overbroad. The analysis of an overbreadth claim under article I, section 5 of the Washing-

ton Constitution parallels the overbreadth analysis under the First Amendment to the United States Constitution. *Bradburn v. N. Cent. Reg'l Library Dist.*, 168 Wn.2d 789, 804, 231 P.3d 166 (2010). Under the First Amendment's overbreadth doctrine, "a statute is facially invalid if it prohibits a *substantial amount* of protected speech." *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) (emphasis added). The overbreadth analysis involves three steps. First, a court must " 'construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.' " *United States v. Stevens*, 559 U.S. 460, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010) (quoting *Williams*, 553 U.S. at 293). Second, after construing the statute, a court must determine whether it "criminalizes a *substantial amount* of protected expressive activity." *Williams*, 553 U.S. at 297 (emphasis added). In determining whether the statute proscribes a *substantial amount* of expressive activity, a court should consider its prohibitions "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292. Third, if the statute is overbroad, a court considers whether to "impose a limiting construction . . . only if it is 'readily susceptible' to such a construction." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997) (*ACLU*) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988)). The overbreadth doctrine is " 'strong medicine,' " which courts should not casually prescribe. *Williams*, 553 U.S. at 293 (internal quotation marks omitted) (quoting *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39, 120 S. Ct. 483, 145 L. Ed. 2d 451 (1999)).

¶67 Neither the majority opinion nor Chief Justice Madsen's dissenting opinion properly follows these analytical steps. The majority opinion errs by failing to recognize that the noise ordinance at issue is susceptible to a narrowing construction. Because it is, I would hold that it is not

constitutionally overbroad. Chief Justice Madsen's dissenting opinion mistakenly suggests that the court must determine whether Immelt's own conduct constitutes protected speech before engaging in the overbreadth analysis. Because such an approach confuses an *overbreadth* challenge with an *as-applied* challenge, I analyze Immelt's constitutional claims separately.

### 1. *Construing the Horn Ordinance*

¶68 The first step in conducting an overbreadth analysis is to determine whether the horn ordinance actually implicates free speech. *See State v. Halstien*, 122 Wn.2d 109, 122, 857 P.2d 270 (1993). By its express language, the First Amendment's protections apply only to "speech." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989). However, conduct can become " 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.' " *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 409, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974)). When determining whether *conduct* rises to the level of symbolic "speech," a court considers two factors: (1) whether the individual who engaged in the conduct intended to convey a particularized message and (2) whether there was a great likelihood that those observing his conduct understood his particularized message. *Id.*

¶69 At this point in the analysis, a court would normally analyze Immelt's own conduct to determine whether her horn honking rose to the level of symbolic "speech." *See Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973) ("Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others . . . ."). However, the overbreadth doctrine allows " 'attacks on overly broad statutes with no requirement that

the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' " *Id*. at 612 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S. Ct. 1116, 14 L. Ed. 2d 22 (1965)). Thus, the pertinent question for overbreadth analysis is not whether Immelt's *own* conduct rises to the level of symbolic "speech" but whether *any* conduct proscribed by an ordinance triggers First Amendment protections. *City of Bellevue v. Lorang*, 140 Wn.2d 19, 26, 992 P.2d 496 (2000) ("An overbreadth challenge is facial, and will prevail even if the statute could constitutionally be applied to a litigant.").

¶70  With these principles in mind, I turn to the county's horn ordinance, which contains several relevant provisions. The horn ordinance prohibits county residents from causing "public disturbance noise." SCC 10.01.040. The horn ordinance contains a general definition of the term "public disturbance noise." SCC 10.01.020(25). In addition to this general definition, the horn ordinance enumerates several activities that result in per se "public disturbance noises." SCC 10.01.040(1). Among these enumerated categories is a provision regarding horn honking that proscribes "[t]he sounding of vehicle horns for purposes other than public safety." SCC 10.01.040(1)(d).

¶71  A very important part of the horn ordinance is the express exemptions from the aforementioned prohibitions. The horn ordinance contains per se exemptions including an exemption for "[s]ounds originating from officially sanctioned parades and other public events." SCC 10.01.050(1)(*l*). A resident can also engage in activities that result in a per se "public disturbance noise" if he first obtains a conditional use permit. SCC 10.01.040(3). A single violation of the horn ordinance is a civil infraction, and a second violation within a 24-hour period is a misdemeanor. SCC 10.01.080(3)(a).

¶72 The horn ordinance implicates free speech rights.[11] On its face the horn ordinance prohibits a driver from honking her horn except for public safety purposes. Absent a narrowing construction, a driver who chose to express her support for a political candidate, a religious cause, an antiwar rally, or a cheerleaders' carwash would run afoul of the ordinance—even where she intended her conduct to express a message that third party observers readily perceived. *See Johnson*, 491 U.S. at 404 (quoting *Spence*, 418 U.S. at 409). The horn ordinance prohibits protected expressive activity. I must, therefore, proceed with the remainder of the overbreadth analysis.

## 2. *The Substantial Amount Requirement*

¶73 The second step in the overbreadth analysis is to determine whether the challenged statute or ordinance prohibits a *substantial* amount of protected activity. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800-01, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984); *Williams*, 553 U.S. at 292.

¶74 I agree with the majority's accurate exposition of the substantial amount requirement. *See* majority at 11. The horn ordinance at issue presents a close call, and it is only in light of the narrowing construction of the exceptions included that I find it constitutional.[12] I agree with the majority "that local governments maintain a legitimate interest in protecting residents from excessive and unwelcome noise." Majority at 11; *Ward v. Rock Against Racism*,

---

[11] I recognize the diversity of opinions concerning the speech implications of horn-honking prohibitions. *Compare Weil v. McClough*, 618 F. Supp. 1294, 1298 (S.D.N.Y. 1985), *and State v. Compas*, 1998 MT 140, 290 Mont. 11, ¶ 27, 964 P.2d 703, *with Goedert v. City of Ferndale*, 596 F. Supp. 2d 1027, 1035 (E.D. Mich. 2008), *and City of Eugene v. Powlowski*, 116 Or. App. 186, 192, 840 P.2d 1322 (1992); *see also Meaney v. Dever*, 326 F.3d 283, 287-88 (1st Cir. 2003).

[12] My survey of other local ordinances indicates that other municipalities have chosen better language to prohibit the noise targeted by Snohomish County's horn ordinance without running the risk of curtailing protected free expression. *See, e.g.*, BELLEVUE CITY CODE 9.18.042(B); EDMONDS CITY CODE 5.30.130(B); SEATTLE MUNICIPAL CODE 25.08.500(B); SPOKANE MUNICIPAL CODE 10.08.020(D)(1).

491 U.S. 781, 796, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989); *Kovacs v. Cooper*, 336 U.S. 77, 83, 69 S. Ct. 448, 93 L. Ed. 513 (1949). Likewise, I agree with the majority that local governments can lawfully prohibit conduct like Immelt's that is designed simply to annoy, harass, and intimidate. *See* majority at 12; *see also Colten v. Kentucky*, 407 U.S. 104, 108-09, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972); *City of Seattle v. Huff*, 111 Wn.2d 923, 930, 767 P.2d 572 (1989). However, the majority and I disagree about the implications of these principles for the horn ordinance. The horn ordinance legitimately proscribes a vast array of conduct that does not rise to the level of constitutionally protected speech. Further, in light of the narrowing construction below, the statute does not prohibit horn honking associated with core protected speech, such as showing support for political or religious causes. I would hold that, in light of the narrowing construction below, the horn ordinance does not improperly burden protected speech when viewed in the context of its plainly legitimate sweep. *See Williams*, 553 U.S. at 292.

### 3. *Narrowing the Construction of the Horn Ordinance*

¶75 My overbreadth determination is contingent on my narrowing construction of the statute. Courts should impose a narrowing construction on an ordinance only if it is readily susceptible to such a construction. *ACLU*, 521 U.S. at 884. However, if an ordinance is susceptible to a constitutional interpretation, this type of constitutional construction is the preferred course. *See United States v. Grace*, 461 U.S. 171, 175, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983) (invalidating, only as applied to sidewalks, a federal statute prohibiting display of devices designed to " 'bring into public notice any party, organization, or movement' " at the United States Supreme Court (quoting former 40 U.S.C. § 13k (1949))); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S. Ct. 2794, 86 L. Ed. 2d 394 (1985) (invalidating a state moral nuisance statute only insofar as

the "word 'lust' is to be understood as reaching protected materials").

¶76 I construe the horn ordinance to provide a very broad exception for "[s]ounds originating from officially sanctioned parades and other public events." SCC 10.01.050(1)(*l*). In my view, the words "officially sanctioned" qualify only "parades" and not "events." The phrasal adjective "other public" serves as the sole modifier for the noun "events." Under this construction, the horn ordinance does not prohibit signs soliciting horn honks in support of political causes, religious causes, antireligious causes, and community events. My determination that the horn ordinance is not overbroad is based on my reading of the "other public events" exception to allow county residents to exercise their protected speech rights. If local authorities attempted to enforce the horn ordinance against a resident exercising his or her constitutionally protected rights to free speech, his or her appropriate remedy is an as-applied First Amendment challenge. Given this narrowing construction of the horn ordinance, Immelt's overbreadth challenge fails.

## B. The Horn Ordinance As Applied to Immelt

¶77 Because I would hold that the horn ordinance is not overbroad, I briefly analyze why Immelt's other claims fail. Generally, " 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' " *Stevens*, 130 S. Ct. at 1584 (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002)). However, courts "cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968). Conduct designed simply to inconvenience or annoy is not protected speech. *Colten*, 407 U.S. at 108-09 (affirming conviction under statute prohibiting

conduct done " 'to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof' " (quoting former Ky. Rev. Stat. § 437.016(1)(f) (1968))). In accord with the First Amendment, article I, section 5 of the Washington Constitution does not provide additional protection for this type of harassment. *See Huff*, 111 Wn.2d at 930 (rejecting claims that ordinance prohibiting harassing telephone calls violated Washington Constitution article I, section 5).

¶78 Immelt's violation of the horn ordinance was not constitutionally protected speech. Her primary intent was to annoy and harass her neighbor, Mr. Vorderbrueggen, and Sergeant Casey and not to express speech. This type of conduct is not protected by the First Amendment or article I, section 5. *See Colten*, 407 U.S. at 108-09; *see also Huff*, 111 Wn.2d at 930.

## C. Vagueness

¶79 Closely related to the overbreadth doctrine is the doctrine of vagueness.[13] "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *Williams*, 553 U.S. at 304.

> "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or [it] is so standardless that it authorizes or encourages seriously discriminatory enforcement."

*Holder v. Humanitarian Law Project*, ___ U.S. ___, 130 S. Ct. 2705, 2718, 177 L. Ed. 2d 355 (2010) (quoting *Williams*, 553

---

[13] I analyze Immelt's remaining constitutional challenges under the federal constitution. Under our jurisprudence, when a right is protected by both state and federal constitutions, the state-based protections must be specifically invoked, argued, and analyzed. *See, e.g., In re Pers. Restraint of Grasso*, 151 Wn.2d 1, 18 n.12, 84 P.3d 859 (2004) (citing *State v. Smith*, 148 Wn.2d 122, 131, 59 P.3d 74 (2002); *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986)). Because Immelt does not provide any *Gunwall* analysis of her constitutional claims, I restrict my analysis to the federal constitution.

U.S. at 304). However, a higher level of scrutiny applies to vagueness challenges in the free speech context. 130 S. Ct. at 2719.

¶80 Unlike an overbreadth analysis, vagueness concerns the particular facts at issue. *Id.* As a rule, " '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.' " *Id.* (alteration in original) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982)). This particular rule "makes no exception for conduct in the form of speech." *Id.* "[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others." *Id.*

¶81 Immelt's vagueness challenge to the horn ordinance fails. She clearly failed to honk her horn for a public safety purpose, and she did not honk her horn at a public event or officially sanctioned parade. Immelt honked her horn to harass her neighbor and Sergeant Casey. Her conduct is proscribed by the horn ordinance and is not constitutionally protected.

D. Prior Restraint

¶82 The horn ordinance is not a prior restraint on Immelt's free speech. Following the United States Supreme Court, this court previously defined a "prior restraint" as:

> " '[A]dminstrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' " M[elville B.] Nimmer, Nimmer on Freedom of Speech[: *A Treatise on the Theory of the First Amendment*] § 4.03, p. 4-14 (1984). . . . Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints.

*In re Marriage of Suggs*, 152 Wn.2d 74, 81, 93 P.3d 161 (2004) (alterations in original) (quoting *Alexander v. United*

*States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 125 L. Ed. 2d 441 (1993)). The First Amendment's prohibition on prior restraints finds its roots in the English common law regarding the requirement that a publisher submit his materials for prepublication censorship before licensing. *Alexander*, 509 U.S. at 554 n.2. Though the prior restraint doctrine now expands beyond its original licensing context, it does not go so far as to encompass all subsequent punishments on potentially expressive activity. *See id.* at 553-54. The horn ordinance legitimately punishes unprotected noise disturbances and does not properly fall under our prior restraint jurisprudence. The appropriate context for Immelt's challenge is under our overbreadth doctrine. Immelt attempted such a challenge, and I would hold that she failed.

CONCLUSION

¶83 I would hold that under the appropriate narrowing construction, recognizing the express exceptions for expressive horn use, the horn ordinance does not violate the First Amendment. As applied to Immelt, the horn ordinance legitimately prohibited her harassing conduct. This court's overbreadth jurisprudence controls Immelt's challenges. As construed, the horn ordinance is not overbroad. For these reasons, I would affirm Immelt's conviction and thus respectfully dissent.